UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| WILLIAM LENTO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 13-10217-GAO |
| RBS CITIZENS, N.A. et al., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

March 11, 2015

DEIN, U.S.M.J.

# I.  INTRODUCTION

The plaintiff, William Lento, is a real estate appraiser in Barnstable, Massachu-

setts.  On June 9, 2011, RBS Citizens, N.A. ("Citizens") placed him on a "Do Not Use"

("DNU") list for the second time, and refused to use his appraisals for real estate loans.

Citizens contends that it did so because it was dissatisfied with Lento's work.  Lento, on

the other hand, takes strong exception to any challenges to the quality of his work, and

contends that he was placed on the DNU list because "he would not cede to the demands

of Citizens' sales force to pump up home values."  (Compl. at 1).  He commenced this

action against Citizens[1] and the Chief Appraiser in its Collateral Risk Management

Group, Kenneth Cote, alleging "tortious interference with prospective economic advan-

---

[1] Lento voluntarily dismissed his suit against the other named defendants: Citizens Bank, Citizens Bank of Massachusetts, and Charter One Bank.  (Docket No. 7).

tage" (Count I), civil conspiracy (Count II), and violation of Mass. Gen. Laws ch. 93A, § 11 (Count III).

This matter is before the court on the Defendants' Motion for Summary Judgment (Docket No. 28) pursuant to which the defendants are seeking dismissal of all of the counts of the Complaint. After careful review, this court finds that even a most generous reading of the record fails to support Lento's factual allegations as to Citizens' motivation.[2] Moreover, he has failed to state any claims as a matter of law. Therefore, and for the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the Motion for Summary Judgment be ALLOWED.

## II.  <u>STATEMENT OF FACTS</u>[3]

The following facts are undisputed unless otherwise indicated.

---

[2]  Nothing herein should be considered an evaluation of Lento's work, a subject on which this court has no opinion. However, the record fails to support Lento's contention that Citizens acted because it wanted Lento to artificially inflate his appraised values.

[3]  The facts are derived from the following materials: (1) Statement of Undisputed Material Facts of Defendants RBS Citizens, N.A. and Kenneth Cote ("DF") (Docket No. 30), (2) the Declaration of Kenneth Cote ("Cote Decl.") (Docket No. 31); (3) the exhibits attached to the Declaration of Geoffrey W. Millsom, Esq. ("Def. Ex. ___") (Docket No. 32); (4) Mr. Lento's Response to Defendants' Statement of Undisputed Facts ("PR") and Plaintiff's Statement of Additional Facts in Opposition to Summary Judgment ("PF") (all contained in Docket No. 36); (5) Lento's Appendix of Exhibits in Opposition to Motion for Summary Judgment ("Pl. Ex. ___") (Docket No. 37); and (6) Defendants' Response to Plaintiff's Statement of Additional Facts ("DR") (Docket No. 42).

## Background

Citizens bank offers its customers a variety of banking and financial products, including mortgage and home equity loans that are secured by the borrower's residence. (DF ¶ 1). As part of its underwriting and due diligence in deciding whether to grant a loan, Citizens commissions an appraisal of the property being used to secure the loan. (DF ¶ 2). Prior to 2010, Citizens contracted directly with appraisers who applied to the bank and were approved to do the appraisal work. (DF ¶ 4). Citizens assigned work randomly within the sub-group of appraisers on the list who worked in the location of any given property. (DF ¶ 4). Citizen did not guarantee any appraiser any work, and the appraiser was not obligated to accept any request for appraisal work. (DF ¶ 5).

In the wake of the subprime mortgage crisis, a number of laws and regulations were enacted to help assure the independence of appraisers. (See DF ¶ 6).[4] As alleged in the Complaint, federal and state laws were enacted, and standards were adopted, to ensure that appraisers remained independent and that lenders did not improperly exert their influence over the appraised values. See, e.g., Mass. Gen. Laws ch. 255F, § 15(k) (it is unlawful to "make any payment, threat or promise, directly or indirectly, to any appraiser of a property, for the purposes of influencing the independent judgment of the appraiser with respect to the value of the property"); see also Compl. ¶¶ 9-19. Among the

---

[4] While some of these statutes provide for private causes of action, no such claim has been asserted in the instant case. Therefore, it is not necessary to describe the statutes and regulations in any detail.

conduct that was prohibited was removing an appraiser from a list of qualified appraisers in order to influence an appraisal, or linking an appraiser's employment to the results of an appraisal. (See Compl. ¶¶ 14, 18). For example, pursuant to 12 C.F.R. § 226.42(c)(1)(i)(D), it is a violation of the Truth in Lending Act to exclude "a person that prepares a valuation from consideration for future engagement because the person reports a value for the consumer's principal dwelling that does not meet or exceed a predetermined threshold."

In light of these enhanced regulations, and in furtherance of the efforts to ensure appraiser independence, in 2010 Citizens, like many other financial institutions, stopped contracting directly with appraisers. (DF ¶ 6; Compl. ¶ 19). Instead, Citizens began to use the services of appraisal management companies ("AMCs"), which are independent and unaffiliated entities that maintain a network of appraisers. (DF ¶ 6). These companies, which were "designed to bolster the integrity of the process and the independence of the appraiser[,]" were responsible for selecting the appraiser, and for supervising and reviewing their work. (DF ¶ 7).

In addition to using the AMCs, at the time at issue in this litigation Citizens maintained its own quality review procedures, which included the review and assessment of appraisals by loan underwriters during the loan application process, and the use of an Appraisal Review Group consisting of approximately seven employees of Citizens. (DF ¶ 8). According to Citizens, if a homeowner took exception to an appraisal, the homeowner typically would complain to the loan officer. The loan officer, in turn, would

decide whether to forward the complaint to the Appraisal Review Group. (DF ¶ 9). The Appraisal Review Group would then review the appraisal for accuracy and thoroughness. (DF ¶ 10). This might include a discussion with the appraiser to address questions involving methodology or comparable sales, for example. (DF ¶ 11). It was not, and is not, unusual for a homeowner to object to the value determined by the appraiser. (DF ¶ 9). According to Lento, he received complaints from borrowers approximately 20-30% of the time. (DF ¶ 9).

According to Citizens' policy, when a member of the Appraisal Review Group had a problem with an appraisal, s/he would add the appraiser to an "issues tracking" spreadsheet, along with a description of the perceived problem. (DF ¶ 12). This spreadsheet was, in turn, reviewed periodically by the Appraisal Review Group's team leaders, to determine if the appraiser should be put on the "Do Not Use" list. (DF ¶ 12).[5] The DNU list was then transmitted to the AMCs with whom Citizens was doing business, so that the AMC would not assign someone on the list to do Citizens' work. (DF ¶ 13). Citizens "neither require[d] nor encourage[d]" any AMC to cease to use the appraiser for non-Citizens appraisals. (DF ¶ 13). Similarly, the AMCs had their own appraisal review procedures and DNU lists, as did other banks and financial institutions. In fact, Fannie

---

[5] Lento denies that Citizens' procedure was followed in his case. (PR ¶ 8). Rather, he contends that he was placed immediately on the DNU list when he refused to accede to Citizens' demands that he artificially inflate an appraised value in connection with the Eddy loan, discussed infra. (See PR ¶ 22). However, while the details are scarce, it does appear that Citizens was tracking Lento's work before the appraisal in question, as evidenced by the fact that several appraisals were cited as the basis for his being placed on the DNU list. (See Pl. Ex. 14).

Mae even makes its list publicly available. (DF ¶ 14). At the time Citizens decided to

put Lento on its DNU list, it had no information whether or not he was, or had ever been,

on the DNU list of any other financial organization. There is no evidence that Lento is

considered as a problem appraiser in the industry, and he appears to have a successful

appraisal business working for various lenders. (See DR ¶ 37; PF ¶¶ 23-25, 28-30).

## The First DNU Placement

Lento became an approved appraiser for Citizens sometime prior to 2008. (DF

¶ 18). He was placed on the Do Not Use list on January 28, 2009 (Def. Ex. F), and

notified of that placement on March 13, 2009 by the defendant Kenneth Cote. (Def. Ex.

G). After inquiry by Lento as to the basis for his exclusion, Citizens, through Cote, sent a

letter on April 3, 2009, detailing problems with three appraisals Lento had conducted.

(Def. Ex. H). Further discussion between Lento and Cote resulted in Lento being rein-

stated on May 6, 2009. (Def. Ex. I). Since Lento contends that these alleged problems

with his work were just a pretense for his being placed on the DNU list "because he

would not use an improperly high comparable value for a Citizens employee's

appraisal[,]" namely Mary Beth Eddy, some detail is necessary. (See PR ¶ 19).

In January, 2009, Lento performed an appraisal on the home of Mary Beth Eddy

of West Barnstable. (DF ¶ 21; PF ¶ 38). She was apparently an employee of RBS

Worldplay, which was then a wholly owned subsidiary of Citizens Financial Group or,

perhaps, RBS Citizens, N.A. (PF ¶ 38; DR ¶ 38). It is Lento's contention that Citizens

believed that Eddy was an employee of Citizens, which Citizens denies, but I find that

this dispute is not material to any issues in this case. (See DF ¶ 31; PR ¶ 31). For purposes of the motion for summary judgment, I will assume that the Bank believed her to be an employee.

Eddy was present while Lento was doing the appraisal of her home, and she informed him that she worked for Citizens and that her husband was an attorney (which apparently was not true). (PF ¶ 40; Pl. Ex. 9 at 33). She stressed to Lento that it was important for him "to come in as high as possible" so that she could get her loan approved. (PF ¶ 40). Lento originally set a value of $635,000, which Eddy apparently thought was too low. (PF ¶¶ 41-42). She did not approve of the comparables he had used because they did not take into account factors that Eddy thought were important, including the fact that they were not on the north side of Route 6A, and did not have an ocean view like she did. (Pl. Ex. 9 at 32-34).

Eddy sent Lento's appraisal to her real estate agent, who had previously listed the house for more than $1 million. (Pl. Ex. 9 at 36). The agent, in turn, suggested several comparables which Eddy forwarded to her loan officer, Steve Olsen, complaining that Lento's appraisal was "way too low." (Pl. Ex. 9 at 37-41; PF ¶ 43).

Olsen sent Eddy's complaint to Thomas Goron, an Appraisal Review Analyst at Citizens, who contacted Lento about Eddy's concerns. (See Compl. ¶ 27, Pl. Ex. 13; PF ¶¶ 44-45). Specifically, Goron wrote to Lento:

> Bill, the borrower is disputing the appraisal and I need some assistance, would you please review the following statements from the borrower and provide us with feedback? The borrower had an

> appraisal on her property completed over the last year.  She had a
> friend who is an appraiser review the current Citizens appraisal and
> came up with some points why they don't agree with the appraisal.

(Pl. Ex. 13).[6]  Goron followed with a list of points he wanted addressed.  (Pl. Ex. 13).

Lento did consider the comments, and revised his appraisal on January 21, 2009,

increasing his appraised value to $650,000.00.  (Def. Ex. B at 84; DF ¶ 23).  Lento also

provided his feedback to Goron on that date by email.  (Pl. Ex. 13).

Specifically, Goron questioned the fact that one comparable Lento used was listed

as having been sold on April 30, 2008 but had, in fact, been sold on November 19, 2008.

(Pl. Ex. 13; DF ¶ 21).  The date of sale was significant for several reasons.  As an initial

matter, more recent sales are generally considered more reliable.  (See DF ¶ 22).  More-

over, because of the rapidly declining real estate market in 2008, Lento had applied a

significant downward adjustment to the comparable sale in question because he believed

that the sale had taken place in April, not November 2008.  (See DF ¶ 22).  Thus, when

he corrected his appraisal due to the admittedly erroneous date, Lento changed his down-

ward adjustment from $58,000 to $7,250.  (Def. Ex. B at 115).  This resulted in a slightly

elevated appraised value in his revised appraisal of January 21, 2009.  (Def. Ex. B at 115-

16).

---

[6]  It is unclear from the record whether Eddy did, in fact, have another appraisal done of her property, or if she had another appraiser review Lento's work.  (See PF ¶ 46).  It appears that she just had the appraisal reviewed by her real estate broker, who was not an appraiser.  (See PF ¶ 43).  Regardless, there is no evidence that Goron was not accurately passing on to Lento the information he had received about Eddy.

Goron also questioned the fact that Lento had failed to identify comparable sale number 2 as being in an inferior location because it abutted train tracks. (Pl. Ex. 13; Def. Ex. B at 116). Lento agreed that this was an error (although he noted that the train ran only infrequently) and corrected it in the revised appraisal. (Def. Ex. B at 116; Pl. Ex. 13). This correction also resulted in an increase to the appraised value. (Def. Ex. B at 116).

Goron also questioned why there were no location adjustments on other comparables because Eddy's property was located on the "desirable Rte 6A side." He also told Lento that Eddy's appraiser had suggested another comparable involving property valued at $829,000. (Pl. Ex. 13). Specifically, Goron wrote:

> 4. The other appraiser suggested using a sale of 1247 Main Street for $829,000. He thought this was a good comp to use for a comparison, but was never used.

(Pl. Ex. 13). Lento wrote back explaining why he did not believe this property was comparable to Eddy's. (Pl. Ex. 13)

Lento has alleged, based on Goron's reference to this potential comparable property, that "[i]n the email, Mr. Goron *pressured* Mr. Lento to use a different property as the comparable property in order to boost the subject property's value[.]" (Compl. ¶ 31 (emphasis added)). He has also alleged that Eddy's loan officer "insisted" that he use the $829,000 comparable. (PR ¶ 30). These characterizations, however, are inconsistent with the language of Goron's email, in which he requested "feedback" in response to Eddy's concerns. Moreover, it ignores the fact that the Truth in Lending Act

expressly provides that it is permissible to "[ask] a person that prepares a valuation to consider additional, appropriate property information, including information about comparable properties, to make or support a valuation" and to "[request] that a person that prepares a valuation provide further detail, substantiation, or explanation for the person's conclusion about the value of the consumer's principal dwelling." See 12 C.F.R. § 226.42(c)(3)(i), (ii). Lento did provide this feedback, and explained why he did not think the suggested comparable was appropriate. (Pl. Ex. 13). There is nothing in the record concerning whether Citizens accepted or rejected his explanation.

On January 28, 2009, Cote sent an email to a Citizens' administrator instructing her to place Lento on Citizens' do not use list. (PF ¶ 52). As Cote wrote:

> Please add William Lento to the DNU. I have attached two appraisals that can be referenced and provided some notes below. He is also very slow in responding to our questions or concerns.

(Def Ex. F; Pl. Ex. 12).[7] In addition to the Eddy file, Cote referenced the "Igo" file, about which he had five comments. (Id.). Thus, it appears that Citizens had been maintaining some record about Lento's work prior to his placement on the DNU list.

Lento was notified of his placement on the Do Not Use list by email dated March 13, 2009. (DF ¶ 20; Def. Ex. G). Lento questioned the reasons for this placement, and Cote responded by letter dated April 3, 2009. (Def. Ex. H). Therein, Cote listed the

---

[7] At the time of his deposition, Cote could not remember whether he had done any analysis of Lento's response time, and Lento disputes the accuracy of this description of his performance. (See Pl. Ex. 1 at 47).

Eddy and Igo appraisals, as well as an appraisal for 16 Brookside Circle. (Def. Ex. H). With respect to that appraisal, Citizens' internal review indicated that Lento's appraised value was higher than what the comparables reflected would be appropriate. (Def. Ex. B at 89-90).

Following his receipt of this letter, Lento spoke with Cote. (DF ¶ 24). While the parties disagree as to Cote's motivation,[8] it is undisputed that on May 6, 2009, Citizen's reinstated Lento as an active appraiser, and removed him from the DNU list to the "watch list." (DF ¶ 25). As Lento was advised, however, his appraisals would continue to be reviewed for quality control purposes. (Def. Ex. I). This was done, and Lento conducted a number of appraisals for Citizens over the following months.

### The Second DNU Placement

On June 9, 2011, Lento was moved back to the DNU list. (PF ¶ 63). As summarized in an email from Cote to Lento dated October 22, 2011, Citizens had continued to have problems with his work. (Def. Ex. J). Thus, while on the "watch list" Citizens' Underwriting Department rated two of Lento's appraisals as "poor" and had a number of other issues with various appraisals. (DF ¶ 26).

Lento responded to Cote's correspondence. In some instances, Lento took exception to Citizens' analysis, but in other situations he admitted that he had made a mistake. (See Def. Ex. J). For example, when the Review Group noted that in one appraisal Lento

_____

[8] Citizens contends that Cote "felt a little soft-hearted" for Lento, while Lento contends that he "adequately defended his appraisals." (DF ¶ 25; PR ¶ 25).

had not adjusted for the fact that a comparable property had a pool, Lento responded: "I am human and the pool was added and adjusted for. . . . This had minimal value influence. Are we supposed to be perfect???" (Def. Ex. J at 2; DF ¶ 27). In another case, Lento responded to an inquiry by incorrectly identifying a comparable property as the subject property. (Def. Ex. J at 2; DF ¶ 28). In other cases, Lento modified his reports in response to comments from the Review Group. (See Def. Ex. B at 125). While Lento does not dispute these facts, his position is that these types of "events" were not "in any way abnormal" and were not the reason he was placed on the DNU list. (See, e.g., PR ¶ 28).

Citizens considered Lento's objections to his being placed on the DNU list. It provided for a further review by the Appraisal Subcommittee. (See Def. Ex. M). Nevertheless, the decision was made to keep Lento on the list. (DF ¶ 29; Def. Ex. M). Citizens conveyed the DNU list including Lento's name to the AMCs with which it worked. (PF ¶ 70; DR ¶ 70). Lento continued to receive other work from the AMCs for other lenders. (PF ¶ 71). If Lento had not been on Citizens' Do Not Use list, he would have received random assignments for appraisals for Citizens. (PF ¶¶ 73-76). However, he would not have been guaranteed any specific amount of work.

### Citizens' Alleged Improper Motive

Lento describes his position as follows:

> Lento alleges that Cote blacklisted him the first time because he
> would not use the $829,000 comparable that Eddy's loan officer
> insisted be used. Lento alleges that Citizens put him back on the

approved appraiser list because Citizens could not justify that
blacklist.  Lento alleges that he was blacklisted the second time
because loan officers put pressure on Cote because Lento's appraisal
values were not high enough.  Cote flat out admitted this.

(PR ¶ 30).  In support of his contention that the loan officers pressured Cote "because
Lento's appraisal values were not high enough," Lento relies on the following facts.

In November 2010, Citizens was seeking to redo another appraiser's report
because it contained a number of factual errors.  (Pl. Ex. 17).  On November 19, 2010,
Lisa Oakley, a loan officer, sent an email to Peter Milton, the new team leader in the
Appraisal Group, with a copy to Mr. Goron, in which she wrote:

Please do NOT use Bill Lento.  A number of issues over previous
months have arisen and he is on a watch list.  Is there someone we
can talk to who can order this for us?  I cannot do it in sales, and I
am not sure the processor can either.  But, let me check with the ops
manager too.

(PF ¶ 62; Pl. Ex. 17).  There is no evidence that Oakley thought the problems with
Lento's appraisals were that they were too low.  In fact, Citizens' objections to Lento's
appraisals included objections to appraised values that Citizens thought were too high.
(See DF ¶ 32 and deposition testimony cited).

Lento's assertion that "Cote flat out admitted" that he was succumbing to pressure
from the loan officers is based on the following facts.  On July 25, 2011, Cote wrote to
Lento as follows:

It was my decision to move you to the DNU.  My reviewers were
having concerns with your reports and they were getting hammered
by sales and their concerns as well.

(PF ¶ 66; Pl. Ex. 19).  As Cote explained at his deposition:

> Q.  Okay.  So when you said "my reviewers," who were you talking about?
>
> A.  People in my group.
>
> Q.  And when you're talking about sales, you were talking about people within the sales department; is that right?
>
> A.  In general, yes.
>
> ....
>
> Q.  When you wrote "their concerns," what did you mean by that?
>
> A.  Poor quality.
>
> Q.  Why would sales raise concerns about poor quality?
>
> A.  While they may believe at times that values are low, they're also concerned that they get good quality appraisals every time to make decisions on their loan.  They're also bank employees, so they have a responsibility for risk management as well.

(Pl. Ex. 1 at 59, 61).  Again, there is no evidence that the concerns of the sales officers were that Lento's appraisals were too low.

Additional facts relevant to this court's analysis are described below where appropriate.

## III.  ANALYSIS

### A.    Summary Judgment Standard of Review

By their motion, the defendants are seeking summary judgment on all counts of the Complaint.  "The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  <u>PC Interiors, Ltd. v. J.</u>

Tucci Constr. Co., 794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)).  Accordingly, the burden is upon the moving party to show, based upon the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law."  Id. (quotations, punctuation and citations omitted).

"Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue."  PC Interiors, Ltd., 794 F. Supp. 2d at 275.  "[T]he nonmoving party 'may not rest upon mere allegation or denials of his pleading,'" but must set forth specific facts showing that there is a genuine issue for trial.  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)).  "The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor."  PC Interiors, Ltd., 794 F. Supp. 2d at 275.  "Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law."  Id.

Applying this standard to the instant case compels the conclusion that the defendants' motion for summary judgment should be allowed.

**B.** **Alleged Absence of Damages**

The defendants argue that Lento "has not suffered any damages, and his purported evidence of damages lacks credibility, is wholly speculative and is legally insufficient." (Defs. Mem. (Docket No. 29) at 10). It is Citizens' contention that since Lento was not guaranteed any specific amount of work from Citizens, his historical compensation from Citizens varied dramatically from year to year, and he has not identified an expert qualified to assess the amount of damages he suffered, Lento cannot meet his burden of proving damages. Moreover, Citizens contends that damages are an element of all of his causes of action. (See id. at 10-15). For his part, Lento denies that damages are an element of all of his causes of action. See, e.g., Jet Line Servs., Inc. v. Am. Emp'rs Ins. Co., 404 Mass. 706, 718, 537 N.E.2d 107, 115 (1989) (attorneys' fees recoverable under Mass. Gen. Laws ch. 93A, § 11 if unfair and deceptive conduct "had some adverse effect upon the plaintiff, even if it is not quantifiable in dollars."), and cases cited. Moreover, he cites to the cases which hold that under Massachusetts law, "an element of uncertainty is permissible in estimating damages and the award of damages is permissible on meager evidence, in particular in business torts where the focus is on the wrongfulness of the defendants' conduct." BBF, Inc. v. Germanium Power Devices Corp., 13 Mass. App. Ct. 166, 177, 430 N.E.2d 1221, 1227 (1982) (punctuation omitted), and cases cited. Finally,

he argues that he is qualified to opine as to damages, and that no expert is necessary. (See generally Pl. Opp. (Docket No. 35) at 12-16).

This court finds Citizens' claims unpersuasive at the summary judgment stage.[9] There is evidence in the record that on several occasions, an AMC assigned Lento an appraisal which was retracted once it was recognized that it was for Citizens. (PF ¶¶ 72-76). This is sufficient to establish that Lento's placement on the DNU caused him at least some quantifiable amount of damages. Further analysis is not necessary at this stage.

## C.     Tortious Interference with Prospective Economic Advantage

In Count I of his Complaint, Lento alleges that the defendants interfered with his relationships with the AMCs "by not allowing the AMCs to hire Mr. Lento to perform appraisals in violation of state and federal law, and, on information and belief, in violation of Citizens's own guidelines." (Compl. ¶ 75). This court recommends that summary judgment be entered in favor of the defendants on this claim, as it is not supported by the factual record or applicable law.

As an initial matter, the record does not support Lento's contention that he was placed on the DNU list because he failed to inflate his appraised values.[10] With respect to

---

[9]  This court expresses no opinion as to the merits of Citizens' objections to the sufficiency of the evidence of damages. These arguments are more appropriately raised in a motion in limine, or at trial.

[10]  This court will assume without analysis that Lento could state a cause of action if Citizens had placed him on the DNU for this reason.

the Eddy loan, the email from Goron simply asked him to explain why he did not use a property as a comparable that the borrower had recommended. There is nothing sinister in the email. Moreover, there is nothing in the record to indicate that Citizens rejected Lento's explanation, or that Citizens obtained a higher appraisal of the Eddy property from another appraiser. In fact, there is nothing in the record to indicate how, if at all, the appraised value affected the amount of Eddy's loan (or even if a loan was made). Lento's theory also runs counter to the undisputed fact that Citizens objected to some of his appraisals because they were too high in light of the available comparables. In short, "[t]he problem with [Lento's] theory is that a careful review of the record reveals no cognizable evidence actually supporting it." Butler Corp. v. Gen. Motors Acceptance Corp., No. 00-30003-MAP, 2002 WL 31926852, at *2 (D. Mass. Dec. 27, 2002) (unpub. op.) (summary judgment for defendant in suit for defamation, unfair trade practices and intentional interference with business relationships arising out of defendant's refusal to finance consumer purchases of plaintiff's vehicles).

Lento's contention that the sales force improperly sought to preclude him from doing appraisals because his values were too low is also not supported by the record. As detailed above, Lento is relying on an email from Lisa Oakley asking that Lento not be used due to a "number of issues" that had arisen. (Pl. Ex. 17). There is no indication that these "issues" related to his appraisals being too high and, given the fact that he admitted to making various factual mistakes in some appraisals, it is not a reasonable inference for a fact-finder to draw. Cote's deposition testimony also does not support such a finding

-18-

— at most, he testified to the sales force being concerned about the quality of Lento's appraisals. This is simply not sufficient to impute an improper motive on the part of the defendants.

Count I should be dismissed for the additional reason that Lento has failed to state a claim as a matter of law. As the court held in <u>Pembroke Country Club v. Regency Sav. Bank</u>, 62 Mass. App. Ct. 34, 815 N.E.2d 241 (2004):

> The elements of a case of tortious interference with an advantageous business relationship are by now firmly established. The plaintiff has the burden of demonstrating that a business relationship from which the plaintiff might benefit existed; the defendant knew of the relationship; the defendant intentionally interfered with the relationship for an improper purpose or by improper means; and the plaintiff was damaged by that interference.

<u>Id.</u> at 38, 815 N.E.2d at 245.[11] This standard applies to prospective business relationships as well. <u>See</u> <u>Blackstone v. Cashman</u>, 448 Mass. 255, 259-60, 860 N.E.2d 7, 12-13 (2007). As detailed below, Lento cannot meet his burden.

As an initial matter, a party cannot be held liable for interfering with its own relationship with another. <u>See</u> <u>DePasquale v. Ogden Suffolk Downs, Inc.</u>, 29 Mass. App. Ct. 658, 661, 564 N.E.2d 584, 586 (1990) ("His claims for tortious interference with

---

[11] The parties disagree as to whether Lento must establish that Cote acted with "actual malice" in putting him on the DNU list. In the employer-employee context, an employer must be found to have acted with actual malice to be liable for intentional interference with advantageous relations. <u>See</u> <u>Blackstone v. Cashman</u>, 448 Mass. 255, 260-61, 860 N.E.2d 7, 13 (2007). Lento argues that this standard has no application here since he was not an employee of Citizens. That issue does not need to be resolved as Lento has not satisfied even the lesser standard of an intentional interference claim.

contractual and advantageous relationships cannot succeed because the defendant race track cannot be liable for tortious interference with its own relationship with the plaintiff."). "A claim of interference with an advantageous business relationship involves one who, without privilege to do so, intentionally induces or causes a third person not to enter into or continue a business relationship with another." <u>Riseman v. Orion Research Inc.</u>, 394 Mass. 311, 314, 475 N.E.2d 398, 400 (1985). Consequently, a party "could not be liable for tortious interference with its own relationship" with another. <u>Id.</u> In the instant case, since Lento is claiming that Citizens interfered with his business arrangement to do Citizens' work, he has not established an alleged interference with a third party. Therefore, his claim should be dismissed.

Moreover, it is well established that "[m]ere refusal to deal does not constitute tortious interference." <u>Spencer Cos. v. Chase Manhattan Bank, N.A.</u>, 81 B.R. 194, 204 (D. Mass. 1987), and cases cited. <u>See also</u> <u>Butler Corp.</u>, 2002 WL 31926852, at *6 ("Again, it must be emphasized that under Massachusetts law, refusal to deal alone does not amount to tortious interference."), and cases cited. Even a most liberal reading of the Complaint establishes that Lento's claim is basically one challenging Citizens' refusal to deal with him. This is insufficient to state a claim.

The Bank was entitled to select the appraisers with whom it wanted to work, especially where, as here, it was legitimately "seek[ing] to protect [its] own financial interests." <u>Mortg. Guar. & Title Co. v. Commonwealth Mortg. Co.</u>, 730 F. Supp. 469,

472 (D.R.I.), aff'd, 915 F.2d 1557 (1st Cir. 1990).  As the court explained in Rhodes v.

Collateral Mortg., Ltd., 695 So.2d 66 (Ala. Civ. App. 1997):

> A defect in a purchaser's title to property offered as security could adversely affect a mortgage lender's monetary interests when money is advanced on the strength of that security; similarly, a defect in the appraisal of the value of particular property, if undetected, could cause a mortgage lender to lend amounts of money far in excess of the actual value of the property pledged, or could cause a lender to reject an application for a loan that seems undersecured based on the faulty appraisal.

Id. at 69.  Given the importance of the appraisal to a lender's business, the Alabama court

in Rhodes held that a lender is not obligated to deal with each and every appraiser who

wants to be on the approved appraiser list.  Id. (summary judgment entered in favor of

defendant lender on appraisers' claim of intentional interference with business relation-

ships based on the lender's removal of the plaintiffs from its approved appraisers list).  In

light of the lender's right to select appraisers, the court further rejected the appraisers'

claim that the lender's decision interfered with their relationship with mortgage brokers

who refused to use them when handling the defendant lenders' loans.  Id. at 67, 69.  The

same results should be reached here.

Finally, the fact that Citizens acted through AMCs does not alter this court's con-

clusion. Any claim that the defendants interfered with Lento's relationships with AMCs

is defeated by the record.  It is undisputed that Lento was free to and did in fact obtain

business from AMCs – there was no interference with that relationship.  See Mortg. Guar.

& Title Co., 730 F. Supp. at 472 (D.R.I.) (defendants' refusal to accept title insurance

policies written by the plaintiff did not constitute intentional interference with plaintiff's contracts with attorneys; plaintiff could continue to contract with any attorney and vice versa); see also Rhodes, 695 So.2d at 67-69 (no interference with appraisers' relationship with mortgage brokers since mortgage brokers continued to use appraisers for transactions other than with the defendant). Under such circumstances, Lento has not established any wrongful interference with his relationship with third parties. For all these reasons, summary judgment should enter in favor of the defendants on Count I of the Complaint.

### D. Civil Conspiracy

In Count II of the Complaint, Lento contends that the defendant is liable for civil conspiracy since Citizens "acted in unison with" and "pressured" the AMCs not to do business with him. (Compl. ¶¶ 80-81). There are two types of "civil conspiracy" recognized under Massachusetts law: one being a "coercive type" and another that is "more akin to a theory of common law joint liability in tort." Aetna Cas. Sur. Co. v. P&B Autobody, 43 F.3d 1546, 1563-64 (1st Cir. 1994). As detailed in his opposition to the motion for summary judgment, Lento is proceeding under the former theory. (Pl. Opp. (Docket No. 35) at 17). This is a "very limited cause of action in Massachusetts" and "to state a claim of [this type of] civil conspiracy, plaintiff must allege that defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently." Aetna, 43 F.3d at 1563 (quoting Jurgens v. Abraham, 616 F. Supp. 1381, 1386 (D. Mass. 1985) (additional citations omitted)). The

-22-

"gist" of this claim is "in the combination itself making unlawful a course of conduct that might not give rise to liability if carried on by a single individual." Fleming v. Dane, 304 Mass. 46, 50, 22 N.E.2d 609, 611 (1939). This type of civil conspiracy is premised upon the "force of numbers" and "it must be shown that there was some peculiar power of coercion of the plaintiff possessed by the defendants in combination which any individual standing in a like relation to the plaintiff would not have had." Id. (quotations omitted). "The most common illustration of such a 'conspiracy' is to be found in the combined action of groups of employers or employees, where through the power of combination pressure is created and results brought about different in kind from anything that could have been accomplished by separate individuals." Id. Other instances which would give rise to liability for this type of conspiracy "are rare" and the list of such instances "should be added to with caution." Id.

In the instant case, Lento has alleged only that Citizens conveyed its instructions to the AMCs that it would not use Lento's appraisals, and the AMCs carried out these instructions by not assigning Lento to Citizens' loans. This is not a situation "where the wrong was in the particular combination of the defendants rather than in the [allegedly] tortious nature of the underlying conduct." See Kurker v. Hill, 44 Mass. App. Ct. 184, 188, 689 N.E.2d 833, 836 (1998). Thus, it is insufficient to state a claim for civil conspiracy and summary judgment should enter in favor of the defendants on this claim as well.

### E. **Unfair and Deceptive Acts and Practices**

In Count III of his Complaint, Lento alleges that the defendants violated Mass. Gen. Laws ch. 93A. It is undeniable that 93A "is a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights." <u>Slaney v. Westwood Auto, Inc.</u>, 366 Mass. 688, 693, 322 N.E.2d 768, 772 (1975). It makes "conduct unlawful which was not unlawful under the common law or any prior statute." <u>Id.</u> In the instant case, however, Lento has not alleged any wrongdoing beyond that alleged with respect to his other claims, and has failed to establish that the defendants engaged in unfair or deceptive acts or practices. As detailed above, the record fails to support Lento's contention that the defendants acted with improper motive. Furthermore, the "refusal to do business does not constitute an actionable unfair trade practice, absent monopolistic purpose or concerted effort to hinder trade" which are not alleged in the instant case. <u>Butler</u>, 2002 WL 31926852, at *5. Similarly, a "refusal to deal alone does not amount to tortious interference" and does not constitute a violation of Mass. Gen. Laws ch. 93A. <u>Id.</u> at *6. Lento's 93A claim is "wholly derivative" of his other claims, and "is likewise insufficient to establish an unfair method of competition or an unfair or deceptive act or practice." <u>Pembroke</u>, 62 Mass. App. Ct. at 40-41, 815 N.E.2d at 247. Summary judgment should enter in favor the defendants on this claim as well.

# IV. **CONCLUSION**

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the Defendants' Motion for Summary Judgment (Docket No. 28) be ALLOWED. [12]

         / s / Judith Gail Dein
Judith Gail Dein
U.S. Magistrate Judge

---

[12] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).